IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| JACQUE BOURRET, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 1:12-cv-03320-RPM |
| | ) |
| ASPECT ENERGY INT'L, LLC, | ) |
| | ) |
| Defendant. | ) |

_____

MOTIONS HEARING
TRANSCRIPT OF PROCEEDINGS
_____

Proceedings held before the HONORABLE RICHARD P.
MATSCH, U.S. District Judge for the District of Colorado,
beginning at 1:55 p.m. on the 22nd day of April, 2014, in
Courtroom A, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:        R. Paul Yetter, Esq.
                          Yetter Coleman, LLP
                          909 Fannin, Suite 3600
                          Houston, TX  77010-1011

                          Frances A. Koncilja, Esq.
                          Koncilja & Associates, P.C.
                          800 18th Street, #300
                          Denver, CO  80202

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES: (Continued)

For the Defendant:            Gordon W. Netzorg, Esq.
                              Sherman & Howard, L.L.C.-Denver
                              633 17th Street, #3000
                              Denver, CO  80202-3622

                              Peter George Koclanes, Esq.
                              Sherman & Howard, L.L.C.-Denver
                              633 17th Street, #3000
                              Denver, CO  80202-3622

1          P R O C E E D I N G S

2      (At 1:55 p.m. on April 22, 2014, in the United States

3   District Court at Denver, Colorado, before the HONORABLE

4   RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5   parties present, the following proceedings were had:)

6      (Whereupon, the recording began with the hearing in

7   progress.)

8      THE COURT:  --before we have a pretrial conference, and

9   that is to say, the motion to strike a jury demand and the

10   plaintiff's motion to strike the counterclaims--or not

11   counterclaims--affirmative defenses.  I didn't tee that up

12   here, but I intend to dispose of that here, because those

13   things affect the approach to the case.

14          The matter of the opinion testimony is something

15   that is a little different, because one of the--I was going

16   to say aspects, but that's not a good term to use here.  One

17   of the factors there is fit, you know, how do these opinions

18   fit the facts of the case.  And there are a lot of facts in

19   this case that I don't know about.

20          But I'm coming to the motion to strike the jury

21   demand.  That has been fully briefed, and I am denying it.

22   The June 13th consulting agreement is, as I said on the

23   summary judgment, the contract in the substance that it

24   defines the mutual promises made and, therefore, the

25   obligation of performance.  Now, the waiver of jury, you

1 know, the contract had--the written agreement, of course, was

2 not signed by either party and had a lot of strike-throughs

3 and changes in it.

4          I'm just such a believer in the constitutional

5 right to jury trial that I am not going to rule that the

6 plaintiff knowingly and intelligently waived that

7 constitutional right by this provision in the contract.  So

8 this will be a jury trial.

9          With respect to the affirmative defenses, the

10 plaintiff sought to strike them as untimely, but that's not

11 correct, because they were raised in answer to the amended

12 complaint.  But I really don't see them as viable affirmative

13 defenses.  I mean, the eighth one is really an issue of

14 causation and really is saying the plaintiff isn't going to

15 be able to prove cause and also justifiable reliance.

16 Economic loss rule, I don't know, you know, I have to ask

17 plaintiff's counsel a few things about their position with

18 respect to the fraud claim in the amended complaint and what

19 it means to the case.  And then the tenth one, the release, I

20 don't see that that's viable, and laches I'm striking out.

21          There are--well, let me ask plaintiff's counsel

22 about the fraud claim in this case, because, you know, as I

23 understand the claim, it is essentially like specific

24 performance of the contract; that is to say, you seek to get

25 the 1.5 per cent of the cash flow.  I don't have the exact--

1  well, the cash flow from the project.  So, you know, in a way

2  you're waiving the fraud and pursuing the contract.

3          What are the damages for the fraud if the fraud be

4  proven?

5      MR. YETTER:  Your Honor, because the fraud--the fraud

6  we're alleging is precontractual fraud, because--

7      THE COURT:  I understand.

8      MR. YETTER:  --the Court has determined that the

9  September--

10      THE COURT:  Never intended to perform the agreement.

11  That's--

12      MR. YETTER:  Exactly, Your Honor.

13      THE COURT:  Yeah.  And the concealment that Compton

14  thinks and already took the position that he got it two years

15  before.

16      MR. YETTER:  Exactly, Your Honor.  So he hired us

17  knowing--presumably, if we accept his position today, he

18  hired us knowing that if we did any job basically in Iraq, he

19  would not pay us.

20          So our position, Your Honor, is, for that

21  fraudulent statement, our reliance damages is that we entered

22  into and devoted our time during this period rather than

23  going to get other projects, which we had in the hopper for

24  other companies, to go find these sorts of concessions out

25  there.  So what we did, our expectancy damages that we are

1  going to ask for are essentially the same as what the

2  contract requires, but we are going to be able to seek that

3  under our fraud claim, since we can get expectancy damages

4  under our fraud claim.

5      THE COURT:  Well, but that's the point I was attempting

6  to understand; that is, are you going to attempt to prove

7  that there were other more profitable arrangements that he

8  could make for other people or other firms?

9      MR. YETTER:  We are going to--we are going to--because

10  he--we were deceived into taking a course of action--

11      THE COURT:  Yes.

12      MR. YETTER:  --and our expectancy was that they would

13  pay on that promise.  So, while, Your Honor, there may be

14  evidence that he could have done other things, our damage

15  model for the fraud claim will be based on our expectancy, we

16  relied on you being honest in that statement, and paying us

17  1-1/2 per cent if we found--originated a project in the

18  Middle East.

19      THE COURT:  Yeah.  Well, how is that different from the

20  contract?

21      MR. YETTER:  Well, the damages are going to be the same,

22  Your Honor, in that sense; but we come about it from a

23  slightly different position.  In the contract they promised

24  that.  In the precontractual--our alleged misrepresentations,

25  they represented that that would be the case.  But we still

1  believe we can get the same damages, Your Honor.

2      THE COURT:  Well, okay.  I'm not sure.  That would be

3  another ground, of course, for denying the motion to strike

4  the jury demand, because you're entitled to a jury on that.

5  But that's not what I'm relying on.  I'm relying on your more

6  basic contention that you didn't know--Mr. Bourret did not

7  knowingly and intelligently waive the constitutional right.

8          But, you know, I'm still confused about the fraud

9  claim.  We don't have to resolve it now, but it does relate

10 to damages and these motions that address the methodology

11 in--to my mind, the essential question on these motions to

12 preclude this opinion testimony is relevance, fit, whether it

13 fits the facts of the case.  And that's where I'm struggling

14 somewhat, because I don't know the facts of the case that

15 well yet.  We'll discuss that here.

16         So I'll turn to defendant's counsel, and thank you,

17 Mr. Yetter.

18     MR. YETTER:  You're welcome, Your Honor.

19     THE COURT:  What I want to have explained to me in the

20 beginning is this--you know, I know there is no dispute about

21 the date of the concession, I'm calling it, with the

22 government.  But I am confused about after the sale, November

23 30, 2012, to this--is it TAQA, the Abu Dhabi National Energy?

24     MR. KOCLANES:  TAQA, Your Honor.

25     THE COURT:  Okay.  After that, does Aspect have any

1    interest in the project, the Atrush project?

2         MR. KOCLANES:  The answer is no, Your Honor.  If I may,

3    Your Honor, may I approach with--

4         THE COURT:  Yeah.

5         MR. KOCLANES:  --a demonstrative, Your Honor, that may

6    help me explain this.

7         THE COURT:  Well, I didn't know whether--you know, there

8    is reference here in the report that you're seeking to

9    preclude Compton.  It's like there was a net profits

10   interest.  He's talking about what is the net profits

11   interest, and I have some familiarity for that, so I wanted

12   to know whether Atrush in the conveyance of the interest

13   retained any interest at all.

14        MR. KOCLANES:  Yes, Your Honor, and the answer to that

15   is no.  If I may, Your Honor, if I may just take a minute--

16        THE COURT:  Well, here's my understanding--

17        MR. KOCLANES:  Yes.

18        THE COURT:  --and see if I'm right.

19        MR. KOCLANES:  If I may, Your Honor, first--

20        THE COURT:  Well, let me give you what I understand, and

21   then you tell me if it's right.

22        MR. KOCLANES:  Sure.

23        THE COURT:  And that is that one of the Aspect

24   companies, at least, entered into this partnership

25   essentially with Marathon, and General Exploration Partners

1  is Aspect 66.5 per cent and ShaMaran--is that how it's

2  pronounced?

3      MR. KOCLANES:  ShaMaran, Your Honor.

4      THE COURT:  ShaMaran--33.5 per cent and Marathon 20 per

5  cent; is that right?

6      MR. KOCLANES:  At one point in time, Your Honor, it gets

7  to be that.

8      THE COURT:  That's how it starts.

9      MR. KOCLANES:  It doesn't start that way, Your Honor.

10     THE COURT:  Oh, okay, then tell me what the facts are.

11     MR. KOCLANES:  Okay.  I appreciate the question, Your

12 Honor, and I would ask just for some patience from you so I

13 can walk you through this--

14     THE COURT:  Okay.

15     MR. KOCLANES:  --because there are some moving parts.

16         If I may, Your Honor, first invite you to look at

17 the demonstrative that I have handed up to the Court.  It's a

18 very simple document.

19     THE COURT:  Where is it?

20     MR. KOCLANES:  It's the chart that says across the top--

21 it's Tab Number 10 in the notebook, Your Honor.

22     THE COURT:  Okay, here.

23     MR. KOCLANES:  Yes, Your Honor, yes.

24     THE COURT:  All right.

25     MR. KOCLANES:  The evidence will show, Your Honor, that

1    in the summer of 2005 Aspect began--efforts began work in

2    Kurdistan. Your Honor, at that point in time Aspect's

3    efforts were directed through an entity called Aspect Energy

4    International, which is one of the defendants in the case.

5        THE COURT: All right. And that is Mr. Cranberg?

6        MR. KOCLANES: That's a company in which Mr. Cranberg

7    has a substantial interest; that's correct, Your Honor.

8        THE COURT: Well, I mean, he is also the active

9    participant?

10        MR. KOCLANES: Yes. He's the head of Aspect Energy

11    International; that's correct.

12        THE COURT: Well, he's the one in Iraq; is that right?

13        MR. KOCLANES: Well, he sent Ibolya Ernyey, his

14    consultant in Iraq, into Kurdistan.

15        THE COURT: Okay.

16        MR. KOCLANES: Between--

17        THE COURT: You know, here's a basic thing, too. I

18    don't understand what's going on in Iraq politically, but it

19    appears that all of you are in agreement that Kurdistan is a

20    regional government.

21        MR. KOCLANES: That's correct, Your Honor.

22        THE COURT: Sort of like a state in the United States,

23    only stronger, and has ownership or at least claims ownership

24    of the natural resources in the region?

25        MR. KOCLANES: That's correct, Your Honor.

1      THE COURT:  And then it gives out these permits or

2  concessions or whatever they're called.

3      MR. KOCLANES:  Production sharing contracts, Your Honor.

4      THE COURT:  Right.  And the central government of Iraq,

5  Baghdad, has no role to play; is that right?

6      MR. KOCLANES:  According to the Kurdistan Regional

7  Government, that is correct, Your Honor.  The Kurdistan

8  Regional Government, pursuant to the Kurdistan region oil and

9  gas law enacted in August of 2007, took the position that the

10  KRG, the Kurdistan Regional Government, had the authority to

11  issue production sharing contracts to contractors like

12  Aspect.

13      THE COURT:  Yeah.  And, at any rate, that's what they're

14  doing.

15      MR. KOCLANES:  That's what they began, yes.

16      THE COURT:  Okay.  All right, go ahead.  Sorry.

17      MR. KOCLANES:  So following, Your Honor, summer of 2005

18  clear up through November 7th of 2007, Aspect engaged in its

19  efforts in Kurdistan through Aspect Energy International.  On

20  November 7th--

21      THE COURT:  And who on the ground?

22      MR. KOCLANES:  Okay.  Ibolya Ernyey was Aspect's

23  consultant and partner--

24      THE COURT:  Still?

25      MR. KOCLANES:  --on the ground, yes.

1        THE COURT:  All right.

2        MR. KOCLANES:  Aspect on November 7th created an entity

3    called GEP, General Exploration Partners, on November 7,

4    2007.  That entity was 100 per cent owned by Aspect.  That

5    was the entity, Your Honor, GEP, that entered into the

6    production sharing contract with the KRG on November 10,

7    2007.

8        THE COURT:  All right.

9        MR. KOCLANES:  At the time, Your Honor, that--

10       THE COURT:  Now, does that document read GEP?

11       MR. KOCLANES:  Yes, it does, Your Honor.

12       THE COURT:  Okay.

13       MR. KOCLANES:  Now, at the time, under the production

14   sharing contract, the Kurdistan Regional Government owned a

15   substantial percentage of the oil and gas rights; Aspect,

16   through GEP, owned a substantial percentage; and the KRG,

17   Your Honor, maintained the right to appoint a local partner,

18   a local participant, for a 20 per cent interest in that

19   production sharing contract.

20       THE COURT:  Now, is the underlying law here different

21   from ours, for example, where you would have a working

22   interest and a royalty interest?  We don't have any of that.

23       MR. KOCLANES:  It's much different, Your Honor, insofar

24   as the contracting party.  Aspect would go in and actually be

25   the equivalent of the operator--

1    THE COURT:  Right.

2    MR. KOCLANES:  --and would take the risk, invest the

3    money, and essentially Aspect carried, Your Honor, the

4    government.  So the government had no risk until there was a

5    discovery.

6    THE COURT:  All right.

7    MR. KOCLANES:  So, Your Honor, beginning on the signing

8    of the production sharing contract--

9    THE COURT:  What's going on in 2007 in the region?  Is

10   that essentially a quiet region from combat activity, war

11   activity?

12   MR. KOCLANES:  As compared to, Your Honor, for example,

13   2003, 2004, 2005, it was much safer.

14   THE COURT:  Okay.

15   MR. KOCLANES:  Now, at the time that Aspect--and

16   inviting Your Honor to refer back to the chart--Aspect owned

17   its interest in the production sharing contract in the

18   Kurdistan project through GEP.  In August of 2010, Your

19   Honor, Aspect sold 33-1/2 per cent of its interest in GEP to

20   a company called ShaMaran, and that's where ShaMaran comes

21   in, Your Honor.  And there's--

22   THE COURT:  Is that a local entity or--

23   MR. KOCLANES:  ShaMaran is a publicly traded company

24   that is in the oil and gas industry.  They're local insofar

25   as they have operations in the so-called Middle East, but

1  this was their big operation or their big interest in

2  Kurdistan.

3      THE COURT:  Okay.

4      MR. KOCLANES:  So as of August of 2010, Your Honor,

5  Aspect had sold essentially one-third of its Kurdistan

6  project to ShaMaran.  The second piece, Your Honor, of

7  Aspect's sale of its Kurdistan project took place and closed

8  on December 31, 2012, and that was in connection with the

9  so-called TAQA transaction, Your Honor.  And at that point in

10  time Aspect sold its remaining 66.5 per cent of GEP as part

11  of the TAQA transaction.

12          And so, Your Honor, as a result of those two

13  transactions, number one, the sale in August of 2010 to

14  ShaMaran of about a third, and the second, Your Honor, was

15  the sale of the remaining 66.5 per cent in connection with

16  the TAQA transaction.  As a result of that, Your Honor, as of

17  close of business on December 31, 2012, Aspect had no more

18  interest in Kurdistan.

19      THE COURT:  Your chart here says "Repurchase and

20  Indemnification Agreement."

21      MR. KOCLANES:   Yes.  What happened, Your Honor, is in

22  the TAQA transaction, TAQA came in and essentially acquired

23  at the production sharing contract level a large portion of

24  the production sharing contract that had been owned by GEP.

25  Aspect redeemed its 66.5 per cent interest in GEP back to

1  GEP, so GEP acquired that, leaving ShaMaran as the 100 per

2  cent owner of GEP.  GEP owned a much smaller interest in the

3  PSC, the production sharing contract, because TAQA had bought

4  it.  And that's the way that transaction worked, Your Honor.

5      THE COURT:  So as of December 31, 2012, Aspect is, from

6  the next day, receiving--I don't know, you know, on the sale

7  whether there is an installment thing or not, but from the

8  production it received nothing.

9      MR. KOCLANES:  That's correct, Your Honor.

10     THE COURT:  So here's the thing.  When I read this

11  contract and it says, "The consultants shall receive 1.5 per

12  cent of the net profits (net cash flow from the project after

13  the company or its relevant affiliate recuperates its

14  original and subsequent investment) in any project

15  originating from the direct and substantial work of the

16  consultant."

17         When I read that, at first I thought that meant as

18  production was going on and Aspect was receiving proceeds

19  from the production.  Now, it appears that you agree with the

20  plaintiff that the contract language applies to the net

21  profits from the sale.

22     MR. KOCLANES:  That's correct, Your Honor.

23     THE COURT:  Okay.  So my first reading, you know, I was

24  reading it more in the context of what I understand to be a

25  practice in the oil industry in the United States where there

1   is a different definition of a net profits interest.  So the

2   issue becomes how you--well, of course, the issue is whether

3   Mr. Bourret earned anything--

4        MR. KOCLANES:  That's correct.  That's the first issue.

5        THE COURT:  --because the core issue is, did this

6   project about which we're speaking come from the direct and

7   substantial work of Bourret, and you're saying no.

8        MR. KOCLANES:  That's correct.

9        THE COURT:  But here is a little confusion that I have,

10  too, because it appears at one place that Ernyey is the one

11  who got it, and then in--as I understood it from the excerpt

12  from Cranberg's deposition, he says he had it sewed up in

13  2005.  What is the defendant's position as to who was

14  responsible for obtaining the--what are we calling it again?

15  I keep--

16       MR. KOCLANES:  The production sharing contract.

17       THE COURT:  Production sharing, yeah.

18       MR. KOCLANES:  And, Your Honor, if I may, they're in

19  connection with the provision that you just referred to.

20  There seems to be two levels of disagreement.

21       THE COURT:  Okay.

22       MR. KOCLANES:  First, Your Honor, is, what is the

23  project?  Is the project the specific production sharing

24  contract that Aspect was awarded?  Was the project--the

25  Kurdistan project, when based upon a lot of work done by Mr.

1   Cranberg, Aspect made the investment commitment, dedication

2   of resources, meeting with, establishing a presence with, the

3   Kurdistan Regional Government.  Was that origination

4   originating the project, Your Honor?  So there is an issue

5   about what is the project.

6          There is a second issue, Your Honor, regarding

7   origination.  Who originated the project?  Our position, Your

8   Honor--and I'll answer your question--is that Mr. Bourret is

9   the plaintiff.  He has the burden under this agreement to

10  prove that he originated it.

11      THE COURT:  I understand that.

12      MR. KOCLANES:  Now, from Aspect's position, Mr. Bourret

13  did not originate this project either at the project level,

14  if you look at the project of an oil and gas project in

15  Kurdistan, or whether you look at the project as the specific

16  production sharing contract awarded to Aspect.  In neither

17  case, Your Honor, was it Mr. Bourret who originated that.

18      THE COURT:  Well, one of the things--and I am looking

19  forward to trial and getting a feel for what's going to be

20  presented.  And I am concerned about how much the trial is

21  going to be concerned with this Hungarian woman and all of

22  these contentions about her activities.  You know, we were

23  looking at that early on as to whether we have Foreign

24  Corrupt Practices Act involvement in this case and her

25  agreeing to pay this political figure or son of a political

1    figure, how much of that we're going to be dealing with in

2    this trial.

3         MR. KOCLANES:  Your Honor, I can tell you right now,

4    respectfully, that we intend--and particularly--and we

5    respect Your Honor's ruling about the jury.  For the record,

6    Your Honor, we, of course, don't agree with it.

7         THE COURT:  Yeah, I know.

8         MR. KOCLANES:  But, frankly, Your Honor, given that this

9    will be a jury trial, there are a number of motions in limine

10   that we intend to file with the Court, one of them being,

11   Your Honor, concerning this Foreign Corrupt Practices Act

12   issue, which is a non-issue for all the reasons discussed

13   last fall.

14        Ms. Ernyey, the Hungarian lady, was deposed; Mr.

15   Bourret's counsel deposed her at the end of February.  She

16   spends most of her time in Hungary, some of her time in

17   Houston.  Deposition lasted most of the day.  There is a very

18   good likelihood here, Your Honor, that her--given that she is

19   in Hungary, that her deposition will be--she will be

20   presented by video.

21        But I agree, Your Honor, Aspect agrees that this

22   case is about a contract and whether Mr. Bourret has met his

23   burden of proving that he's entitled to an additional

24   1-1/2 per cent of Aspect's net profits, Your Honor, under

25   that agreement.  That's what this case is about.  It's not

1  about foreign corrupt practices; it's not about alleged

2  bribes.

3      THE COURT:  Well, yeah, but if--what I am understanding

4  you to be saying now is that you would like to define

5  "project" broadly and not this particular grant; correct?

6      MR. KOCLANES:  That's correct, Your Honor.

7      THE COURT:  And the second is, because of that, it all

8  starts in 2005--

9      MR. KOCLANES:  That's correct, Your Honor.

10     THE COURT:  --when the relationships began to build.

11     MR. KOCLANES:  That's correct.  And, Your Honor, even

12  if--even, Your Honor, if "project" is defined as narrow as

13  this particular production sharing contract, Aspect's

14  position is, it originated through going to Kurdistan,

15  meeting all of and working with all of the high-ranking

16  Kurdistan representatives, making its presence known,

17  investing time, money; that all of that, Your Honor, led to

18  the production sharing contract awarded in this case.

19     THE COURT:  Well, wasn't there a time when the

20  contemplation was that the area that was most promising for

21  activity leading to production was an area different from

22  this Atrush area; is that right?

23     MR. KOCLANES:  There were other areas, Your Honor,

24  Aspect looked at.  And Mr. Cranberg, through his work, looked

25  at a number of different areas and sites within Kurdistan as

1   being very prospective, one of which was the Atrush

2   formation.

3        THE COURT:  Atrush, yeah.

4        MR. KOCLANES:  Yes.  Your Honor--

5        THE COURT:  And then along comes Hunt; Hunt gets a deal,

6   the plaintiff says; and it gets its interest through this

7   Ster Group.  And Mr. Bourret's contention here, as I

8   understand it, is he gets the Ster Group; they come here to

9   the United States; they talk to your people; and things

10  happen from there.  I think that's the plaintiff's case, as I

11  understand it.

12       MR. KOCLANES:  As I understand it as well, Your Honor.

13       THE COURT:  So--

14       MR. KOCLANES:  But that's, frankly, not the case.  What

15  happened in this case, Your Honor, is that Aspect began work

16  in 2005.  It made a number of different proposals to the

17  Kurdistan Regional Government for a block.  One of the

18  proposals, actually, Your Honor, covered the Atrush block

19  back in May of 2007.  Aspect's proposal covered a portion of

20  the Atrush block.

21            But notwithstanding that, Your Honor, the evidence

22  will show that there is no evidence that Ster got Aspect

23  anything, Your Honor.  In fact, when I deposed Mr. Bourret--

24  and Your Honor has seen this deposition testimony before in

25  prior motions--he can point to no evidence that Ster had any

1    communications with the Kurdistan Regional Government to get

2    Aspect the block or anything else.  This is just a story that

3    Mr. Bourret has put together, but it doesn't hold weight; it

4    doesn't hold water, Your Honor.  And the evidence will show

5    that there is no evidence to support that Ster did anything.

6         THE COURT:  Okay.  Well, let me turn to plaintiff's

7    counsel.  I mean, these are your motions, but I need to--

8         MR. KOCLANES:  Yes.  And at one point, Your Honor, I

9    would like to address, if I may and if Your Honor would like,

10   the issue that Your Honor raised about Mr. Bourret's fraud

11   damages--

12        THE COURT:  Yes.

13        MR. KOCLANES:  --because there are no such--we have not

14   seen any evidence of any fraud damages.  And at the

15   appropriate time, Your Honor, I'd be happy to address that,

16   and I would like to address it.

17        THE COURT:  Well, all right.

18           Mr. Yetter?

19        MR. YETTER:  Yes, Your Honor.

20        MR. KOCLANES:  Thank you, Your Honor.

21        THE COURT:  First of all, are you in disagreement with

22   this timeline?

23        MR. YETTER:  Well, first let me say, Your Honor, if I

24   could, I too am looking forward to trial.  This is going to

25   be a very interesting case for the jury.  I think the Court

1 is going to really enjoy it as well, and we're very much

2 looking forward to it.

3        This timeline, to specifically answer your

4 question, the dates are right, Judge, but we do disagree with

5 how they are characterizing some of the transactions, and I

6 can--

7        THE COURT:  Well, the key thing is, your witness,

8 Compton, is assuming a continued interest in the production.

9        MR. YETTER:  So let me explain--

10        THE COURT:  And where does that come from?  I mean,

11 that's an assumption he makes in doing his computation.

12        MR. YETTER:  It is not an assumption, Judge.  It is from

13 the contract.  You read--just a minute ago you read from the

14 consulting agreement the provision for the 1-1/2 per cent

15 project interest.  And if you want to look back at what you

16 were just reading, Judge, you said Mr. Bourret "shall receive

17 1-1/2 per cent of the net profits."

18        THE COURT:  Right.

19        MR. YETTER:  And then they define what net profits are.

20        THE COURT:  Right.

21        MR. YETTER:  "In any project originating from the direct

22 and substantial work of Mr. Bourret."  And so the parentheses

23 defines net profit as "net cash flow from the project after

24 the company or its relevant affiliate recuperates its

25 original and subsequent investment."

1          So what Mr. Compton, who is our damages expert,

2   what he's done is he looked at the contract language, and he

3   said, okay, I'm assuming Mr. Bourret originated the project.

4   He's not--

5          THE COURT:  Well, yeah, you know, that has to be the

6   assumption.

7          MR. YETTER:  Yes, sir.  Under the contract, under the

8   agreement, Mr. Bourret gets his 1-1/2 per cent net profits

9   interest on the project, not part of the project, not

10  whatever--

11         THE COURT:  Well, how are you defining project?

12         MR. YETTER:  Well, the project is what they get money

13  from, Judge.

14         THE COURT:  Right.

15         MR. YETTER:  In your summary judgment order, one of the

16  positions that the defendants took is project means Iraq or

17  maybe Middle East or maybe Kurdistan.  But you don't get

18  money because you're interested in Iraq.  You get money

19  because you get a concession--

20         THE COURT:  Right.

21         MR. YETTER:  --a production sharing contract.  And it's

22  Atrush.  That's the only thing they're getting money from.

23         THE COURT:  All right.

24         MR. YETTER:  So the project is Atrush.  Now, what our

25  expert is saying--and he's not making any value judgments;

1  he's just reading the contract.  He's saying, "I have to

2  calculate 1-1/2 per cent of the net profits of the project."

3  It says, "In any project."

4      THE COURT:  Well, the company is not receiving anything

5  today.

6      MR. YETTER:  Well, and I'll get to that, Judge.

7          So then it says, "Of the relevant affiliate," and

8  say who owned the project?  Well, the project was owned--and

9  we agree with--the defendants agree with plaintiff on this--

10  was owned by this entity called GEP.  GEP used to be called

11  Aspect Energy Kurdistan, and then they changed the name to

12  General Exploration Partners to own the Atrush contract.  In

13  the beginning that was a hundred per cent owned by Aspect.

14      THE COURT:  Right.  There is no production at that time.

15      MR. YETTER:  No production.

16      THE COURT:  Right.

17      MR. YETTER:  No profits, no production.

18      THE COURT:  Right.

19      MR. YETTER:  Then Aspect invited in a partner called

20  ShaMaran, and that partner made a capital contribution to

21  GEP.  That's not profits; that's not Atrush; that's a capital

22  contribution.  They basically became a partner.

23          Now, the entity that we have to look at, Your

24  Honor, our belief--and this is a contractual issue, and this

25  may even be a disputed fact issue for the jury, but it's a

1   contractual issue, not a damages issue.

2       THE COURT:  So it's a legal question.

3       MR. YETTER:  Well, it's a legal question unless the

4   Court finds that there are disputed fact issues.  But the

5   legal question is:  What is the relevant affiliate?  Now, I

6   believe that defendants have agreed that GEP is the relevant

7   affiliate.  So in Time One GEP owns a hundred per cent of

8   Atrush, and Aspect owns a hundred per cent of GEP.  In Time

9   Two Aspect invites in a partner, and they split it two-

10  thirds/one-third.  But GEP is still the person we're

11  looking--the entity that we're looking at for net profits.

12          So, Your Honor, what our damage expert has done is

13  he said, "When has the project generated net profits?"  And

14  there's been two--and he looked at one time frame in

15  particular, two different sources.  When the interest was

16  sold at the end of December 2012, TAQA, the Abu Dhabi

17  company, comes in and pays about $600 million for two-thirds

18  of the interest in GEP.  And we agree on this.  The

19  defendants agree with the plaintiff, that's cash flow that

20  goes into the net profits calculation.

21      THE COURT:  Right.  That's agreement.

22      MR. YETTER:  Yes, that's agreed.  Now, our damage expert

23  says, "But the contract doesn't just say what Aspect owns of

24  the relevant affiliate at the time of profits.  It says, what

25  is the profits to the relevant affiliate?"  So as of the end

1  of 2012, the relevant affiliate is GEP.  It's very much an

2  affiliate of Aspect; it owns two-thirds of it.  And at that

3  point there is current cash flow and expected future cash

4  flow.

5  THE COURT:  What's that expectation based on?

6  MR. YETTER:  That expectation is based on future cash

7  flow.

8  THE COURT:  To whom?

9  MR. YETTER:  To GEP.  So if the relevant--

10  THE COURT:  I don't see that GEP has any source of

11  future cash flow.  That's why I asked about--all of its

12  interest is gone.

13  MR. YETTER:  No, Your Honor.  GEP continues to hold an

14  interest in Atrush even to this day.

15  THE COURT:  Well, that's just contrary to what counsel

16  just told me.

17  MR. YETTER:  What counsel told you is that Aspect sold

18  its interest in GEP at the end of 2012.  And so--

19  THE COURT:  Well, Compton is using ShaMaran's cash flow.

20  MR. YETTER:  Compton is using GEP's cash flow as

21  calculated by ShaMaran.

22  Now, this is the bottom line, Your Honor, to boil

23  it down to a simple sentence.  Mr. Bourret found a hundred

24  per cent of the project.  Aspect promised him in this

25  agreement to pay him his interest on a hundred per cent of

1   the project.  What Aspect now wants to do, Your Honor, is pay

2   him on only two-thirds of the project.

3        THE COURT:  That doesn't make any sense to me.

4        MR. YETTER:  Well, it is somewhat complicated, Your

5   Honor, but this--

6        THE COURT:  Well, it isn't complicated at all.  If they

7   have no interest--if these defendants have no interest in

8   future production from whatever wells there are there, they

9   don't have any money coming in.

10       MR. YETTER:  Let me give an example if I could, Your

11  Honor.  So at Time One they say, "I want you, Mr. Bourret, to

12  go find this very profitable oil concession."  Aspect says

13  that.  He does that.  He finds one in northern Iraq.  It's

14  called Atrush.  Aspect says, "I'm setting up a separate

15  company called GEP--"

16       THE COURT:  I'm all through that, all right--

17       MR. YETTER:  I understand--

18       THE COURT:  --but tell me on what basis you claim that

19  the defendants continued to receive money from this

20  production sharing contract after December 31, 2012.

21       MR. YETTER:  After December 31, Your Honor, our damage

22  expert calculated it on December 31, 2012.

23       THE COURT:  Well, that's part of it.  But now we're

24  talking about his calculation of future profit.

25       MR. YETTER:  The future--he calculates it the last day

1  they own an interest in GEP.  On December 31, Your Honor, GEP

2  is very much an affiliate of Aspect, and he calculates it

3  that day.  And he says that affiliate has past cash flow and

4  future.

5      THE COURT:  Yes, I'm with you on that.  That's a

6  question of what deductions you should take to define net

7  profit from the sale.

8      MR. YETTER:  Yes.

9      THE COURT:  But now he goes on to talk about future cash

10  flow.

11      MR. YETTER:  As calculated on the last day that Aspect

12  still owned an interest in GEP.  And, Your Honor, it really

13  comes down to this:  Under this contract, can Aspect, by

14  simply bringing in a partner, avoid paying this 1-1/2 per

15  cent on future cash flow of GEP?

16      THE COURT:  Well, where is the future cash flow of GEP

17  after December 31, 2012?

18      MR. YETTER:  Okay.  After December 21--after December

19  31, 2012--

20      THE COURT:  Right.

21      MR. YETTER:  --GEP still owns 25 per cent of Atrush, and

22  there will be--

23      THE COURT:  Well, where do you get that?

24      MR. YETTER:  So--okay, if you want to look at--well, let

25  me see if I can give you a--

1      THE COURT:  They sold everything they had.

2      MR. YETTER:  No, GEP didn't, Your Honor.

3      THE COURT:  Well, we better get to this, and I think

4  this is a question of law--

5      MR. YETTER:  Okay.

6      THE COURT:  --because I cannot follow Compton's

7  computation.  You know, he can testify about how you

8  calculate net profits from the sale of the interest.  And

9  that's a dispute, and we can deal with that.  But where he

10  gets to this projecting future income, I don't follow it, and

11  I don't understand it to be based on any evidence that I'm

12  aware of.  But that's why I'm saying the chicken and the egg

13  thing, because I don't know.

14      MR. YETTER:  So let me make a suggestion, Your Honor.

15  This is something that you'd have to decide based on the

16  evidence in this case.

17      THE COURT:  That's right, in part.

18      MR. YETTER:  We are perfectly happy to put him on right

19  at the--I mean, put him on to testify, but put him up for the

20  Court--

21      THE COURT:  No, because his--

22      MR. YETTER:  At any point that--

23      THE COURT:  The question is factually whether there is

24  any future revenue of any kind--

25      MR. YETTER:  For GEP.

1      THE COURT:  --from this project--not project--from this

2  production sharing agreement after the sale.

3      MR. YETTER:  And we will factually prove that to you,

4  Your Honor.  We will factually prove that the relevant

5  affiliate, GEP, still will be getting future cash flow from

6  Atrush.  And what our damage fellow does is--

7      THE COURT:  Forget about the damage fellow.

8      MR. YETTER:  Okay.

9      THE COURT:  He's basing this--he's using a methodology

10  that I can understand and that is admissible.  But the

11  question is, when he's talking about something beyond

12  December 31, 2012, I can't follow it, because I've been told

13  by the opposition that there isn't any.

14      MR. YETTER:  Then we just have a factual dispute, Your

15  Honor, because what we're going to prove is after December

16  31, 2012, GEP retains an interest in Atrush and has future--

17      THE COURT:  What is the interest that it retained?

18      MR. YETTER:  25 per cent.

19      THE COURT:  How do you calculate that?

20      MR. YETTER:  It is--so, Your Honor, I'm sorry.  I should

21  have a chart for you and show you step by step.  I don't have

22  it at my fingertips--

23      THE COURT:  All right.  I--

24      MR. TILLINGHAST:  --but factually we will prove it at

25  trial.

1      THE COURT:  I abhor motions in limine, but I guess we

2  have to do that here.  And I don't know, since factual

3  questions are for the jury, but in a part this is also an

4  interpretation of the contract language.

5      MR. YETTER:  Well--and that's where I--as I said at the

6  outset, Your Honor, this may come to Your Honor to decide

7  what the contract means, if it's unambiguous, or Your Honor

8  may ask the jury to interpret it if it's ambiguous.

9      THE COURT:  Well--

10     MR. YETTER:  But as a factual matter, I will represent

11 to the Court, there is no question we will prove GEP, after

12 December 31, 2012, retains a 25 per cent interest, which then

13 goes down about three months later to 20 per cent.  But it is

14 a value that our damage expert--

15     THE COURT:  Well, what is that based on?

16     MR. YETTER:  It is based on--so it's based on

17 contractual documents, Your Honor.  But we will show you and

18 the jury step by step--

19     THE COURT:  No, we're not talking about the jury yet,

20 because--

21     MR. YETTER:  Well, we'll show you, Your Honor, step by

22 step--

23     THE COURT:  --this goes to the question of whether to

24 admit part of Compton's calculations.

25     MR. YETTER:  And I understand how important it is, Your

1    Honor.  And as of today, I believe there are five owners of
2    Atrush.  It would be GEP, which is now a hundred per cent
3    owned by ShaMaran; it would be the Kurdistan government, two
4    entities of the Kurdistan government; it would Marathon; and
5    it would be TAQA.  They each own a percentage of the
6    production sharing contract.
7         THE COURT:  Well, you just told me ShaMaran owns all of
8    GEP.
9         MR. YETTER:  Absolutely, Judge.
10        THE COURT:  Well, where are these defendants?
11        MR. YETTER:  These defendants promised to pay for all of
12   the cash flow--1-1/2 per cent for all of the cash flow from
13   this project.
14        THE COURT:  To them.
15        MR. YETTER:  Well, that's where we disagree, Your Honor.
16   So this is what my example is going to be.  I can say I
17   promise to pay you for that entire project and then
18   distribute some of my interest to my family, to relatives, to
19   friends; but I still own the obligation to pay on a hundred
20   per cent of the project.  And so what Aspect did is they
21   voluntarily chose to bring in a partner, but they still owe
22   that net profits project interest to Mr. Bourret for a
23   hundred per cent of the project.  Mr. Bourret found the
24   entire project.  Aspect promised to pay him--
25        THE COURT:  The contract reads, "The net profits from

1 the project after the company or its relevant affiliate

2 recuperates."

3      MR. YETTER:  Exactly.

4      THE COURT:  Are you saying the relevant affiliate is

5 ShaMaran?

6      MR. YETTER:  The relevant affiliate is GEP.

7      THE COURT:  I don't understand your position.

8      MR. YETTER:  Your Honor, I would love to be able to

9 explain to you more.  It is GEP, because GEP owns--

10      THE COURT:  Are you saying that you're reading this

11 contract to say whoever gets the money?

12      MR. YETTER:  Yes.  That's what Aspect--

13      THE COURT:  Well, that's--

14      MR. YETTER:  That's what Aspect promised.  They said--

15      THE COURT:  Well, that isn't what this language says.

16      MR. YETTER:  Well, Your Honor, this is our position.

17 What Aspect--

18      THE COURT:  Let's brief this question as to the

19 interpretation of the language.

20      MR. YETTER:  Well, this--and so this would be our--this

21 is our position, Your Honor.  Aspect said, "You find us the

22 project, we will pay you your net profits interest on a

23 hundred per cent of it."  If Aspect then chose to have the

24 project sit in another entity, to bring in other partners,

25 it's fine.  That's Aspect's choice.  But they still have to

1  pay on a hundred per cent of the net profits; it goes to the

2  relevant affiliate.  That's GEP.

3      THE COURT:  Who is the relevant affiliate?

4      MR. YETTER:  GEP.

5      THE COURT:  GEP has been sold to ShaMaran.

6      MR. YETTER:  GEP--it has been sold a couple of times,

7  and Aspect still owes the obligation to pay the interest on a

8  hundred per cent of the net profits to GEP.  Otherwise, Your

9  Honor, then that sale to--

10     THE COURT:  Well, you know, this makes no sense to me.

11     MR. YETTER:  I understand, Your Honor.  It is--

12     THE COURT:  I guess I'll give you an opportunity to try

13  to make sense, but--

14     MR. YETTER:  And I will do my best the next time, Your

15  Honor.

16     THE COURT:  I don't understand it at all.

17     MR. YETTER:  It is complicated, but it--

18     THE COURT:  I don't think it's complicated.  You're

19  saying even after they divest themselves of any revenue-

20  producing interest, they still owe money?

21     MR. YETTER:  They owe money to the person that found the

22  whole project, because that's what they promised him, Your

23  Honor.  Otherwise, they're only going to pay on two-thirds of

24  the project.  How could that be what they intended at the

25  beginning?  Then no one pays Mr. Bourret his percentage on

1   one-third of the project.

2        THE COURT:  You know, this is a promise made by an

3   entity.

4        MR. YETTER:  It is.

5        THE COURT:  It is a promise to share an interest in a--

6        MR. YETTER:  It is not a promise--this is a promise to--

7        THE COURT:  Well, it's a promise to pay consulting--

8        MR. YETTER:  On the net profits of the whole project.

9        THE COURT:  No matter who owns it.  That's your

10  position.

11       MR. YETTER:  Of the whole project, Judge.  Our position

12  is they promised to pay on the whole project.

13       THE COURT:  You know, I guess I'm too old or something.

14  I can't follow you at all.

15       MR. YETTER:  I understand, Your Honor.  But our position

16  is very simple.  He found the whole project; they promised to

17  pay him on the whole project.  If they brought in partners,

18  they promised--Aspect promised to pay for the partner's

19  share.  That simple.

20       THE COURT:  ShaMaran's.

21       MR. YETTER:  Exactly.

22       THE COURT:  Well--

23       MR. YETTER:  Now, that is Aspect's--if Aspect wanted to

24  say, as long as we own an interest in that relevant

25  affiliate, they could say that.  As long as, no, we don't

1  bring in any partners, they could have said that. But they

2  didn't, Your Honor. What they said is, we will pay you this

3  on the net profits in any project.

4      THE COURT: All right. We'll set up a briefing schedule

5  on the meaning of the contract, including some factual--I

6  don't know, Mr. Koclanes, I'm trying to get a--so we can get

7  a resolution of this and not submit this to the jury,

8  because, well, I don't understand the plaintiff's position.

9      MR. KOCLANES: Your Honor, neither do we.

10      THE COURT: And you're going to say you don't understand

11  it either.

12      MR. KOCLANES: Neither do we, Your Honor. And this, if

13  I may, is exactly why there is a case called Daubert out

14  there and why the Court needs to exercise a gatekeeping

15  function.

16      THE COURT: Well, no, this isn't Daubert.

17      MR. KOCLANES: It's--

18      THE COURT: This is, what is the basis upon which the

19  opinion fits the facts.

20      MR. KOCLANES: That's right, Your Honor. And you have

21  an expert that's being endorsed by the plaintiff that has

22  come up with its own interpretation of the agreement. The

23  agreement, as Your Honor points out, says its relevant

24  affiliate. As of 12/31/12 close of business, GEP is no

25  longer an affiliate of Aspect. Your Honor has it. And under

1   this language, Your Honor, it's a very simple calculation.

2   The reason, Your Honor, why the plaintiffs have--

3          THE COURT:  The issue that I was prepared to deal with

4   here was, okay, Compton's method of attempting to define the

5   net proceeds, net profit, from the sale.  You know, as I

6   understand it, the defendants and the affiliate now, GEP, got

7   nothing from this project until--forget project--from this

8   contract until the sale.

9          MR. KOCLANES:  Until the--

10         THE COURT:  That's its first revenue.

11         MR. KOCLANES:  That's correct, Your Honor.

12         THE COURT:  And you tell me there is no future revenue

13  source.

14         MR. KOCLANES:  What I said, for Aspect there is not,

15  Your Honor.  Aspect sells everything it owns--

16         THE COURT:  And GEP is--

17         MR. KOCLANES:  --in GEP.  It's gone.  And that's--let me

18  tell you, Your Honor, that the reason why--Mr. Yetter is a

19  very good lawyer.  But the reason why Mr. Bourret is taking

20  this position is that if--if someone is going to go through

21  and calculate under this provision the way Your Honor reads

22  it, which is the way Aspect's expert reads it, if there is

23  liability, Your Honor, only if there's liability--

24         THE COURT:  Well, of course.

25         MR. KOCLANES:  --it's 5.7 million.  By including all

1   these future revenues for some entity in which Aspect has no

2   interest, the damages go up, Your Honor, to 9.8 or 11.8

3   million.  That's what we're fighting about.

4        THE COURT:  Well, yeah, I understand that.  And even if

5   there is a source of future revenue here, it is speculative

6   as to how much is going to be recovered from the oil.  I

7   mean--

8        MR. KOCLANES:  We don't know the price of oil, Your

9   Honor.  We don't know the price of oil.  We don't know--

10       THE COURT:  Well, not only that--

11       MR. KOCLANES:  --the cost of production.

12       THE COURT:  --you don't know whether the Kurdistan

13   Regional Government is going to exist.

14       MR. KOCLANES:  Exactly.  Aspect is gone.  Close of

15   business 12/31/12 Aspect is out.

16       THE COURT:  Yeah.

17       MR. KOCLANES:  Aspect's expert, Your Honor, does the

18   checkbook analysis; what are Aspect's revenues from this

19   project?  Revenues from the ShaMaran sale, revenues from the

20   TAQA sale.  Those were the revenues.  Aspect's expert then

21   goes and looks at what are the expenses, all the investments

22   through Aspect, through GEP, figures it all out, and comes up

23   with a number.  That's what this agreement says, not some

24   speculative future cash flow.

25       THE COURT:  I understand that.  I'm trying to give

1    plaintiff's counsel an opportunity to explain his position to

2    me, because as of now, it is my understanding that there are

3    no future revenues; and, therefore, Compton's calculations

4    with respect to future damages, present value, whatever, are

5    out.  So I'll give him a chance to show me why they're in,

6    because I don't know.

7            So, to my mind, that is essentially an

8    interpretation of the contract language and appropriate for

9    me to decide.

10   MR. KOCLANES:  Yes, Your Honor.

11   THE COURT:  Now, the other thing is this fellow who is

12   an expert on how to get deals in the Middle East.  I'm

13   granting your motion.

14   MR. KOCLANES:  Thank you, Your Honor.

15   THE COURT:  He doesn't have--you know, I think the

16   situation is unique to Kurdistan, and you have to look at it

17   in that respect, not Middle East generally, not Qatar, not

18   all of the other oil-producing countries.  So I am excluding

19   him.

20   MR. KOCLANES:  Thank you, Your Honor.

21   THE COURT:  And now we get to the--you know, it looks to

22   me like Compton's damages for the future are out, too, but

23   I'll give you an additional chance to try to persuade me on

24   that; that is, not you but Mr. Yetter.

25   MR. KOCLANES:  Understood.

1    THE COURT:  And then you made a spine-chilling comment

2  here that you've got a bunch of motions in limine in mind.

3    MR. KOCLANES:  Your Honor, I apologize for that and,

4  again, respect your decision.

5         There was one more, Your Honor, motion directed at

6  one of their so-called experts, Mr. Bourret.  They're trying

7  to endorse--

8    THE COURT:  Yeah, well--

9    MR. KOCLANES:  --Mr. Bourret as an expert.  That's

10  completely inappropriate, Your Honor.  He's got no expertise

11  in word origination.  We're not trying to prevent Mr. Bourret

12  from testifying as to things that a lay witness can testify

13  to, but he can't come in--

14    THE COURT:  I don't expect to receive his opinions.

15    MR. KOCLANES:  I'm sorry?

16    THE COURT:  I do not expect to receive his opinions.

17    MR. KOCLANES:  Hearsay or anything else.

18    THE COURT:  This designation of expert in the rules is

19  unfortunate, you know.  All that we're talking about is the

20  admissibility of opinions.  And to say this is an expert, he

21  can or can't testify, it's a question more--he may--as the

22  plaintiff has some lay opinion that may be admissible in his

23  testimony, I can't tell in advance.  We're not going to try

24  this thing in segments.

25         So I will rule on the admissibility of his

1    testimony as he testifies and those objections are weighed,

2    but I am not going to designate him as an opinion witness.

3        MR. KOCLANES:  Thank you, Your Honor.  Thank you, Your

4    Honor.

5        THE COURT:  So, I don't know, I told you what I thought

6    about your affirmative defenses.  I didn't give you a chance

7    to argue them further, but I don't really see their

8    relevance.

9        MR. KOCLANES:  Your Honor, if I may have the opportunity

10   to argue them further, I would appreciate that.

11       THE COURT:  All right.

12       MR. KOCLANES:  I'd like to start--

13       THE COURT:  You know, it does seem to me the eighth one

14   is particularly really not an affirmative defense.  The

15   burden of proof on causation, the burden of proof on

16   justifiable reliance, is all with the plaintiff.

17       MR. KOCLANES:  Your Honor, we agree with that.  And,

18   Your Honor, we would withdraw that.

19       THE COURT:  Yeah, that's not something you have the

20   burden on.

21       MR. KOCLANES:  No.  We withdraw that one.

22       THE COURT:  The economic loss rule is applicable or not,

23   depending upon whether this is a contract case, and that's

24   why I asked with respect to the damages that may be sought to

25   be proven under the fraud.  But, of course, the economic loss

1 rule may be applicable.  I don't know.

2   MR. KOCLANES:  Well, Your Honor, all we're asking for is

3 that the defense be in there.  They sought to strike it.

4   THE COURT:  Yeah.

5   MR. KOCLANES:  And as far as the fraud damages, Your

6 Honor, we've seen no evidence of fraud damages.

7   THE COURT:  Well, we'll talk about that further at a

8 pretrial conference.

9   MR. KOCLANES:  Okay, thank you, Your Honor.

10   THE COURT:  And, I don't know, this release--the release

11 that you cite there doesn't seem to me to add anything new in

12 this case.

13   MR. KOCLANES:  Well, it does insofar, Your Honor, as

14 that at the time, the way that Mr. Bourret even came to the

15 attention of Aspect was through some discussions Aspect had

16 with this entity called Arcacia (phonetic).

17   THE COURT:  Yeah.

18   MR. KOCLANES:  And Aspect--

19   THE COURT:  But his claim wasn't--you know, that--what's

20 the date of that release or settlement agreement?

21   MR. KOCLANES:  It was dated in December of 2007 after

22 Mr. Bourret claims he had done everything he needed to do to

23 originate.  It was after--

24   THE COURT:  Yeah, but--

25   MR. KOCLANES:  --Mr. Cranberg told Mr. Bourret, "You're

1   not going to any--you're not going to get a 1.5 per cent,"

2   according to what Mr. Bourret alleges.

3       THE COURT:  Well, you know, I took a quick look at the

4   language that was shown to me.  It didn't seem to me to be

5   relevant to this case.

6       MR. KOCLANES:  Well, Your Honor, we would like the

7   opportunity to present the release to the jury and make our

8   arguments based upon it.

9       THE COURT:  Well, all right, we'll keep that in for now

10  and discuss it further as to what you're relying on.  And I

11  don't see the laches.

12      MR. KOCLANES:  Your Honor, the basis for the laches

13  defense is this, and Your Honor, I'm sure, is aware of the

14  recent Colorado Supreme Court decision, the <u>Hickerson v.</u>

15  <u>Vessels</u> case.

16      THE COURT:  I'm not aware of any Colorado Supreme Court

17  decisions, recent or not.

18      MR. KOCLANES:  Okay.  Well, this decision was handed

19  down by the Colorado Supreme Court in January of 2014.  And

20  essentially the Colorado Supreme Court held that the defense

21  of laches may apply, even if there is time left to run on the

22  statute of limitations defense.

23      THE COURT:  Well, what are the facts of it?  How did it

24  come out?

25      MR. KOCLANES:  It was a promissory note case.  There

1    were some partial payments that were made that under the law

2    allowed the statute of limitations to go forward into the

3    future, and the issue was raised whether there was a laches

4    defense.  One of the Judges I respect, Your Honor, down in

5    the Denver District Court, Judge Hoffman, ruled--first he

6    ruled that laches prevented--

7        THE COURT:   I assume you respect all of the Judges.

8        MR. KOCLANES:  Especially the ones in this building,

9    Your Honor.

10           And so, anyway, it went to the Colorado Court of

11   Appeals.  The Colorado Court of Appeals held that if there

12   was still time left on a statute of limitations--

13       THE COURT:  I see.

14       MR. KOCLANES:  --laches could not apply.  It went up to

15   the Colorado Supreme Court.  The Colorado Supreme Court said

16   laches could apply even if there was time left on the statute

17   of limitations.

18           What we have here, Your Honor, is a situation where

19   the production sharing contract was awarded on November 10,

20   2007.  Mr. Bourret testified in his deposition that, as of

21   that point in time, he did everything he needed to do to earn

22   that 1-1/2 per cent.  Mr. Bourret alleges that he met with

23   Mr. Cranberg on November 11th or 12th, during which time Mr.

24   Cranberg said, "You didn't earn the 1-1/2 per cent.  You're

25   not going to get the 1-1/2 per cent."

1      That was in November of 2007.  Mr. Bourret waits

2  until December of 2012 to bring his claims.  We believe, Your

3  Honor, that the claims are barred by laches, given the

4  conduct I've just described.

5      THE COURT:  What was the prejudice to your clients on

6  the delay?

7      MR. KOCLANES:  The prejudice, Your Honor, is that in

8  connection with the two transactions that we've talked about,

9  both the ShaMaran sale in August of 2010 and then the TAQA

10  transaction in December of 2012, that had Mr. Bourret

11  actually brought his lawsuit before Aspect sold its interest,

12  all of its interest, in Kurdistan in the production sharing

13  contract, if he would have brought the claims before that,

14  Aspect would have factored that into its deal transaction and

15  made provision for the fee that Mr. Bourret claims is owed.

16  That's the prejudice, Your Honor, essentially laying in the

17  weeds for five years before he brings this claim.

18      THE COURT:  All right, I won't strike it, but I doubt

19  it.  You know, this--actually, if he'd have brought the claim

20  before that deal, it might have affected the purchasers

21  willing to go forward.  It could have affected the deal

22  adversely.  So the fact that he didn't bring it may have been

23  a benefit.

24      MR. KOCLANES:  We don't know, Your Honor.  That would be

25  up to the fact finder to determine.

1        THE COURT:  Yeah.

2        MR. KOCLANES:  That being said, Your Honor, I think the

3    points you're making here are excellent points as we move

4    forward with this case, that Your Honor both look at the

5    plaintiff's allegations, the defendant's allegations, and

6    defenses under the same light, because we have the same issue

7    with Mr. Bourret alleging that somehow Ster did something.

8    There's no evidence of it, Your Honor.  It's the same issue.

9    And it goes both ways.

10       THE COURT:  Yeah.  Well, I don't want to try this case

11   on motions in limine.  That's what I'm saying.  But I do

12   think we do need to do some work to set the parameters for

13   the trial.  Otherwise, it could just be amorphous and not--

14   the jury would get lost.

15       MR. KOCLANES:  Your Honor, I agree with that.  And I

16   think the issue you raised, if I may, Your Honor--and I would

17   like the opportunity to at least address the point that Mr.

18   Yetter made, the point that you made, concerning these

19   so-called fraud damages.

20       THE COURT:  Yeah.

21       MR. KOCLANES:  Because there's a fundamental flaw in Mr.

22   Bourret's thinking concerning his fraud case.  The fraud case

23   seems to be that Aspect failed to disclose to Mr. Bourret

24   before Mr. Bourret entered into the consulting agreement that

25   Aspect had already originated--

1      THE COURT:  Right.

2      MR. KOCLANES:  --the project.  And in Number One we

3  cited some cases in our motion, Your Honor, in our opposition

4  to their motion, that a failure to disclose that a condition

5  of the contract could not be met is not fraudulent

6  inducement.  That's--

7      THE COURT:  Well, yeah, I'm not reading it quite that

8  literally.

9      MR. KOCLANES:  Fair enough, Your Honor.

10     THE COURT:  The way I am looking at it is sort of a

11  classic case:  I entered into a contract with somebody, and I

12  never intend to perform it.  I mean, that's classic fraud.

13  And what seems uphill about that is, what are you doing with

14  this contract anyway?

15     MR. KOCLANES:  Well, this is the problem, Your Honor--

16     THE COURT:  I mean, why are you entering into an

17  agreement with this guy if you've already got the deal?

18     MR. KOCLANES:  This is the problem, Your Honor, with Mr.

19  Bourret's theory is that the fraudulent inducement is that

20  somehow Aspect bamboozled Mr. Bourret to sign a contract

21  where Mr. Bourret was paid $30,000 a month totaling $660,000.

22     THE COURT:  With all of the expenses.

23     MR. KOCLANES:  All the expenses, the total of which on

24  those come up to more than 900,000.

25     THE COURT:  Yeah, well--

1    MR. KOCLANES:  Mr. Bourret says, "Well, if I would have

2    known about this, maybe I wouldn't have signed the

3    agreement."  Well, then he wouldn't have been paid $960,000.

4    THE COURT:  You know, this also gets to this question of

5    how do you define the project.  And it seems to me that's a

6    matter that should be resolved by me before trial also.

7    MR. KOCLANES:  I think so, Your Honor.  I think so.  I

8    also believe, Your Honor, that in terms of the fraud damages,

9    the fraud damages are not the same.

10    THE COURT:  No.  I--

11    MR. KOCLANES:  If Mr. Bourret originated, then he's

12    entitled to the 1-1/2 per cent under the contract.

13    THE COURT:  Yeah.

14    MR. KOCLANES:  If Mr. Bourret didn't originate and there

15    was fraud, he's not entitled to the 1-1/2 per cent.  That

16    makes no sense, Your Honor, but that's what I'm hearing Mr.

17    Bourret argue.

18    THE COURT:  Well, there is an old common law expression

19    of "waive the fraud and sue in assumpsit," waive the fraud

20    and sue on the contract.  That's sort of basic.  And that's

21    why I was asking the questions about this, because this claim

22    really is specific performance of a contract.

23    MR. KOCLANES:  That was our view, Your Honor.  In fact,

24    I might remind the Court, if I may, at the October 31st

25    hearing Your Honor had indicated that it was taking a very

1  close look and was sort of--

2      THE COURT:  Yeah, well, that's when I ruled out quantum

3  meruit.

4      MR. KOCLANES:  You ruled out quantum meruit, but then--

5      THE COURT:  And then it comes back in the amended

6  complaint and--

7      MR. KOCLANES:  It comes back in this fraud claim.

8  That's why, Your Honor, it just--Your Honor, if I may, a

9  ruling on the fraud claim, drilling down into what are the

10  damages because they're not the 1-1/2 per cent, would be very

11  helpful.  We've seen no evidence of any other damages.

12          But to come in here and argue to a jury under a

13  fraud claim, either Mr. Bourret originated or he didn't.  If

14  he originated and the jury finds that he originated, he gets

15  the 1-1/2 per cent.  If he didn't originate and Aspect had

16  originated before Mr. Bourret entered into the consulting

17  agreement, Mr. Bourret does not, Your Honor, get 1-1/2 per

18  cent.  There's no support for that.

19      THE COURT:  Yeah, okay.

20      MR. KOCLANES:  But that's what they're arguing.

21      THE COURT:  Well, let's get to teeing up these

22  questions, and I think we've got two questions of contract

23  interpretation.  And one is:  What is the project?  You've

24  raised that.  And the other is:  How do you get support for

25  the opinion that there is continued cash flow?  And it seems

1  to me you are to go first on your contention that the project

2  is broader than the--I still call it concession, and so you

3  go forward on that.

4        Mr. Yetter, you go forward on, yeah, there's a

5  basis for Compton's future damages.

6        And I really think that this fraud thing ought to

7  be reconsidered.

8        MR. KOCLANES:  Your Honor, I would move the Court that

9  it be reconsidered and--

10        THE COURT:  Well, I am asking counsel to reconsider it.

11        MR. KOCLANES:  Your Honor, I would--if I--

12        THE COURT:  Procedurally I don't have anything here,

13  but--

14        MR. KOCLANES:  If I may, Your Honor--

15        THE COURT:  You can file a motion on that.

16        MR. KOCLANES:  Thank you, Your Honor.

17        THE COURT:  All right.

18        MR. KOCLANES:  Because I--Your Honor, again, I respect

19  your decision on the jury.  This needs--there's been a lot of

20  sensational claims made in this case.  The jury shouldn't

21  hear all this.  We need to focus this in for the jury, you

22  know, none of this FCPA, none of this bribe stuff.  Let's

23  figure out, did Mr. Bourret originate or didn't he originate?

24  That's the issue here, Your Honor.  If he originated and they

25  find it that way, they can award the 1-1/2 per cent.

1          THE COURT:  Well, I got you.  I hear you.

2              So set a time.  You can file a motion attacking the

3     fraud.

4          MR. KOCLANES:  Thank you, Your Honor.

5          THE COURT:  And also your motion on defining project

6     under the contract.  When do you want to do it?

7          MR. KOCLANES:  We could submit something, Your Honor, in

8     ten days.

9          THE COURT:  All right.  What is ten days, Mr. Smith?

10         THE CLERK:  May 2nd is a Friday.

11         THE COURT:  What date?

12         THE CLERK:  May 2nd, Friday.

13         THE COURT:  May 2nd.

14              Mr. Yetter, what do you want to do?

15         MR. YETTER:  Works for us, Judge.  Ten days is just

16    fine.

17         THE COURT:  All right, both ways.  And then you can file

18    responses--

19         MR. KOCLANES:  Thank you, Your Honor.

20         THE COURT:  --within ten days after that, each side.

21    All right?  And we'll see--

22         MR. KOCLANES:  Your Honor, would you entertain replies

23    or no replies on these?

24         THE COURT:  No replies.  If I have some doubt about it,

25    I'll invite you here.

1    MR. KOCLANES:  Okay, thank you, Your Honor.

2    THE COURT:  All right.  Something else, Mr. Yetter?

3    MR. YETTER:  Yes.  I have one last thing, Your Honor.

4    THE COURT:  All right.

5    MR. YETTER:  And I don't mean to jump ahead of the

6    Court, but we are--if you are ready for a pretrial

7    conference, we're ready whenever you're ready, Judge, because

8    I think we're getting really close.  This case is ready to

9    get tried; and whenever you're ready, Judge, we're ready for

10   that to happen.

11   THE COURT:  You know, you're not that far away from

12   trial today.

13   MR. YETTER:  Okay, well, we're--

14   THE COURT:  This isn't one where there's a pretrial

15   conference and then a year before the trial.  We'll get you

16   in.  We'll get you in--

17   MR. YETTER:  And I don't mean to rush the Court.  I know

18   you've got--you're a busy docket.

19   THE COURT:  We'll get you in within the year certainly.

20   MR. YETTER:  I'm--

21   THE COURT:  Within this year certainly.

22   MR. YETTER:  Well, I was actually hoping this summer or

23   this spring or something like that.

24   THE COURT:  Well, part of it--

25   MR. YETTER:  I'm ready when you're ready, Judge.  I

1  think this case is--

2      THE COURT:  Part of it kind of depends on understanding

3  your claims.

4      MR. YETTER:  Well, you know, I'm listening to you,

5  Judge.  We're not going to make this complicated for the

6  jury.  A couple of quick things.  We hear what you're saying

7  about reconsider the fraud claim.  We didn't file this as a

8  fraud case.  We filed this as a contract case.

9      THE COURT:  I know you did, but you say in the amended

10  complaint it's fraud.

11      MR. YETTER:  But this is the defendant coming in and

12  saying, hey, you know, it was Mr. Cranberg, and he originated

13  two years before he hired you.  If that's true, that's the

14  basis of our fraud claim.  It's exactly what the Court said.

15      THE COURT:  Yeah, but, you know, where does it go?

16  Why do you--

17      MR. YETTER:  Well, that's what we're going to--we're

18  going to explain that to you.

19      THE COURT:  Right.

20      MR. YETTER:  At some point we may have to elect; at some

21  point you may just say--

22      THE COURT:  I think you ought to elect now, but you have

23  to talk--

24      MR. YETTER:  Well I'm a big believer in streamlining

25  cases, Judge, especially for juries.

1      THE COURT:  You have to talk to your client about that.

2      MR. YETTER:  We will.  We will.  We will.

3      THE COURT:  But you can tell your client what my

4  suggestion is.

5      MR. YETTER:  And I hear you, Judge.  And if that means

6  we're going to trial earlier--

7      THE COURT:  Yes.

8      MR. YETTER:  --I am definitely going to keep that in

9  mind, because--

10      THE COURT:  Well, I'm not doing that as a bargain.  I

11  don't want--

12      MR. YETTER:  Well, I was maybe trying to suggest that

13  maybe we get a little--I'm kidding.

14      THE COURT:  Streamlining the case will assist the day on

15  which we empanel a jury.

16      MR. YETTER:  Yes, I absolutely realize that, Judge.

17      THE COURT:  Okay.

18      MR. YETTER:  Thank you very much for your time today,

19  Your Honor.

20      THE COURT:  All right, recess.

21      (3:06 p.m. - Whereupon, the proceedings were concluded.)

22

23

24

25

1        <u>TRANSCRIBER'S CERTIFICATE</u>

2              I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6              Dated at Aurora, Colorado, this 25th day of April,

7    2014.

8

9

10

11

12                                <u>/s/ Sylvia Besel</u>

13                                Sylvia Besel

14                                Federal Reporting Service, Inc.

15                                17454 East Asbury Place

16                                Aurora, Colorado  80013

17                                (303) 751-2777

18

19

20

21

22

23

24

25